UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | 18-CR-10241 (FDS) |
| | ) | |
| JOSEPH KUKSTIS | ) | |

<u>SENTENCING MEMORANDUM OF THE UNITED STATES</u>

I.     <u>Introduction</u>

Defendant Joseph Kukstis is a serial cyberstalker.  Over the course of a decade, he used anonymous text messaging applications and social media accounts to torment women:  current and former girlfriends, school acquaintances, and strangers he had just met over social media. Kukstis emotionally abused each of them, through relentless demeaning language, by humiliating them, or by encouraging them to kill themselves.  At the stroke of a key, Kukstis inflicted lasting harm on these women — harm that in several cases changed the way they relate to the world.

To punish this conduct, to protect the public from this dangerous defendant, and to deter Kukstis and others from weaponizing the digital tools of modern life, the United States respectfully requests that the Court sentence the defendant to a Guidelines prison sentence of 51 months, which is the top of the agreed upon sentencing range in the parties' plea agreement, and to three years' supervised release in which Kukstis' use of electronic devices would be subject to reasonable restrictions and monitoring.  The Court should also order Kukstis to pay the required $300 special assessment and restitution to Jane Doe A totaling $23,507.

II.     The Offense Conduct

*Jane Doe A*

By the time an FBI investigation revealed Kukstis to be Jane Doe A's anonymous stalker, she had suffered through more than two years of harassment and humiliation.  (PSR, ¶ 9).

Kukstis bombarded Jane Doe A with hundreds of degrading messages using an anonymizing application known as textPlus, all while posing as a sympathetic boyfriend and later ex-boyfriend.  (PSR ¶¶ 11, 15).  Kukstis did not hold back on any topic, whether it was Jane Doe's mental health ("Kill yourself you depressed piece of shit"); her body image ("U fat bitch/U stupid fat cunt"); or her self-image ("You're worthless nobody will ever love you").  (PSR ¶ 11).

Kukstis' messages and actions were also threatening.  Jane Doe A received one March 2017 text message with her own street address and the words "See you soon."  (PSR ¶ 11(b)).

When Jane Doe A changed her phone number in an attempt to end the harassment, she received a text to her new number stating "found you".  (PSR ¶ 11(c)).  These messages terrified Jane Doe A to the point where she went to her local police precinct to report the harassment and to request that officers accompany her home.  (Complaint Affidavit, Docket No. 4, ¶ 16).  Jane Doe A also received unsettling emails indicating that passwords to her social media accounts had been reset (or had been subject to attempts to reset), making it seem to Jane Doe A that Kukstis was everywhere in her digital life.  (PSR ¶ 13).

Kukstis also demeaned and humiliated Jane Doe A to others, including by sending a private image of Jane Doe A engaged in a sex act to her friends over an Instagram account that Kukstis established in her name.  (PSR ¶ 12).  Kukstis also harassed Jane Doe A's friends and male acquaintances, interfering with her ability to seek their support and comfort.  (PSR ¶ 14).

The government expects that Jane Doe A will address the Court directly at sentencing,

but she has already made clear that Kukstis left her feeling violated, afraid, and isolated. *See* Complaint Affidavit, Docket No. 4, ¶ 18 ("She felt that she was being emotionally manipulated, felt powerless, and questions what she did that was so bad to deserve this treatment."). On May 2, 2017, Jane Doe A texted a friend that her harasser was "ruining friendships[.]  [E]veryone that gets involved is sketched out and stops being my friend." Id., ¶¶ 24(d). The United States also expects that Jane Doe will share with the Court that she has moved away from Massachusetts, where she has lived her whole life near family, to get away from Kukstis and her experience with him.

  *Jane Does B through E*

  Unfortunately, Jane Doe A was neither the first nor the last of Kukstis' stalking victims. The FBI's investigation unearthed nine years' worth of threatening and humiliating conduct.

  In September 2009, at age 20, Kukstis impersonated another young man, "R.B.," over social media, and used R.B.'s identity to ask "very personal questions" of a young woman, including her location and her work schedule, causing the young woman to feel like she was being watched. (PSR ¶ 36).

  Before 2013, Kukstis sent anonymous texts to Jane Doe D, an elementary school friend, attempting to drive her and her boyfriend apart. Kukstis used language that he would later repeat with Jane Doe A, accusing Jane Doe D of being fat and worthless and suggesting that she should kill herself. (PSR ¶ 18). Five years later, Jane Doe D still fears that calls from blocked telephone numbers might be Kukstis.

  In early 2013, Kukstis cyberstalked a romantic partner, texting Jane Doe E from anonymous phone numbers; calling her names; and harassing and threatening to hurt her. (PSR ¶ 86). As he had with Jane Does A and D, Kukstis attempted to access Jane Doe E's social

media accounts without permission.  (PSR ¶ 21).  Ultimately, on February 14, 2013, Jane Doe E

sought and obtained a restraining order against Kukstis.  (PSR ¶ 86).

> Kukstis' conduct left Jane Doe E feeling isolated.  (Attachment A hereto).

> … I had wonderful friends and family around me but my friends were getting tired of losing access to their social media accounts and soon the text messages started on their phones. The people closest to me started to distance themselves because of someone I dated for just four short months. My trust in people began to dwindle and simple tasks such as leaving my house alone to run an errand, became a fearful experience because I never knew when he was going to show up. I lived in fear.

To this day, Kukstis' conduct has had a lasting impact on Jane Doe E:

> …I am a different person than I was then. I have a layer of anxiety that covers me and keeps me from trusting not just the men I choose to date, but everyone; in fear this could happen again. I prefer not to be alone because I am worried that I will be cornered in a bad situation and in the instance that Mr. Kukstis shows up, I would be anxious and terrified to see him, even after all this time has passed. Unfortunately, as a result of Mr. Kukstis, I still live in fear every single day that I could be harassed to the point of depression and suicidal thoughts like I was five years ago. I have not had any desire to pursue a long-lasting relationship since I was twenty years old and I'm not sure I will again. I see a therapist regularly and have been working hard for five years to eliminate some of the negative thoughts and feelings tied to this crime, however I'm not sure I will ever fully heal. I am fearful Mr. Kukstis will retaliate against me for coming forward and speaking about this. Nevertheless, I know how important it is to share my experience and how this has impacted my life in order to show the court the impact Mr. Kukstis has had on my life.

(Attachment A).

> Jane Doe B, Kukstis' girlfriend in 2014, experienced a similar range of harassment that

transitioned to physical assault.  (PSR ¶¶ 23-28).  Kukstis impersonated a childhood crush of

Jane Doe B's over social media and solicited intimate pictures of her.  When Jane Doe B

succumbed to the requests, Kukstis (posing as the childhood crush) threatened Jane Doe B that

he would tell Kukstis about the pictures she had shared.  (PSR ¶ 24).  These and similar

encounters led Jane Doe B to break up with Kukstis, which in turn led to a physical confrontation

in which Kukstis put his hands around Jane Doe B's neck.  (PSR ¶ 26).

Kukstis was charged with domestic assault and battery and suffocation/strangulation in Massachusetts as a result.  (PSR ¶ 27).  Both charges were continued without a finding for one year, but Kukstis violated the resulting restraining order and period of probation by anonymously contacting and harassing Jane Doe B throughout the first half of 2015, including with a message that said "Bang Bang."  (PSR ¶¶ 27-28, 88).  These anonymous contacts led to Kukstis being charged criminally with violating the abuse prevention order as to Jane Doe B, (PSR ¶ 29), which resulted in a nine-month term of pre-trial probation—a period that overlapped with Kukstis' beginning to harass Jane Doe A.  (PSR ¶ 29).

Kukstis changed Jane Doe B's life.  She was unwilling to renew her abuse prevention order for fear of standing in the same courtroom with him.  (PSR ¶ 89).  She remains fearful of him.  She has curtailed her social media use.  She avoids visiting a relative who lives near Kukstis for fear of running into him.  (PSR ¶¶ 30-31).

In November and December 2017, even after Kukstis had largely abandoned harassing Jane Doe A, he found a new victim.  After befriending Kukstis online, Jane Doe C started to receive anonymous texts from Kukstis that purported to be her ex-boyfriend—against whom Jane Doe C had a restraining order resulting from an assault.  When Jane Doe C confronted Kukstis about impersonating her boyfriend, he responded with his stock-in-trade:  text messages stating, "You're fat this was funny you suck"; "Glad your day is ruined"; and "Kill yourself [Jane Doe C]."  (PSR ¶¶ 32-34).  Jane Doe C, who had only known Kukstis for a matter of weeks when he harassed her, continues to fear him.  (PSR ¶ 35).

III.     Sentencing Guidelines & Recommendation

The PSR assigns Kukstis a Criminal History Category of I and a total offense level of 22.
The resulting Guidelines Sentencing Range ("GSR") is between 41 and 51 months, which is
consistent with the parties' calculations in the plea agreement.  (PSR ¶ 120).

For the reasons stated below, the United States respectfully requests that the Court
sentence Kukstis to a within-Guidelines sentence of 51 months' imprisonment on each of the
three Counts in the Information; 3 years' supervised release under the conditions proposed by
the Probation Office;[1] the required $300 special assessment, and to pay restitution to Jane Doe A
totaling $23,507.  This sentence is sufficient, but not greater than necessary:  (1) to reflect
Kukstis' egregious conduct toward all of his victims and to provide just punishment; (2) to
protect Jane Does A through E and the public from future crimes by Kukstis; (3) to deter Kukstis
from harassing Jane Does A through E and others upon his release; and (4) to promote respect
for the law and to deter individuals similarly situated to Kukstis from anonymously stalking
others.

A.     Cyberstalking Harms Victims and the Public

Cyberstalking is a serious offense that has profound consequences for victims and for the
public alike.  It is an offense that is about power and control, disproportionately harms and

---

[1]The proposed conditions regarding the defendant's limited and monitored use of social media
reasonably balance the need for him to live and function in a world that is increasingly dependent
on digital communication on the one hand, with restrictions that address the particular conduct
that led Kukstis to a federal criminal conviction for cyberstalking on the other.  The United
States requests only that Special Condition 11 (regarding the use of Kukstis' true name) be
amended to make clear that it applies to the defendant's registration for electronic
communication services and social media accounts, and not simply to his use of aliases
generally.  By restricting the number of devices that Kukstis may access (Special Condition 4)
and by making it easier to detect and investigate recidivism (Special Conditions 5-7, 11), the
Court and the Probation Office should be able to both protect the public and rehabilitate Kukstis.

affects women, and typically occurs within the context of intimate partner or domestic violence.

*See Malta-Espinoza v. Gonzales*, 478 F.3d 1080, 1086 (9th Cir. 2007) (Duffy, J., dissenting)

("The stalker often seeks a sense of power or control over his victim, usually through fear.")[2]

"Being stalked, and suffering the fear and threats that characterize the crime" is

significantly correlated with symptoms of post-traumatic stress disorder ("PTSD") and

psychological distress.[3]  Specifically, for victims, stalking typically causes health problems,

including higher levels of fear, distress, anxiety, PTSD, depression, and insomnia.[4]  Stalking also

causes significant economic harms, including loss of time from work, loss of a job or job

opportunities, the inability to take advantage of employment opportunities, reduced productivity

or job performance, the need to change residencies, legal fees, and health and mental treatment.[5]

In addition, while stalking is typically a more "psychological" than "physical" offense, an

individual who stalks a victim is, unsurprisingly, more likely to harm the victim.[6]

---

[2]*See, e.g.*, U.S. Department of Justice, Office on Violence Against Women, 2014 Report to Congress at 2 (January 2017), available at https://www.justice.gov/ovw/page/file/932736/download (last visited November 14, 2018) (hereinafter "DOJ, Report to Congress") (noting that 1 in 7 U.S. women and 1 in 19 U.S. men have experienced stalking in their lifetimes, and the most common relationship between victim and stalking perpetrator is that of current or former intimate partner).

[3]DOJ, Report to Congress at 4.

[4] *See* U.S. Department of Justice, Office of Justice Programs, National Institute of Justice, Intimate Partner Stalking: Fear, Psychological Distress and Health Impacts, available at https://www.nij.gov/topics/crime/intimate-partner-violence/stalking/Pages/fear-distresshealth.aspx (last visited November 14, 2018) (hereinafter "DOJ, Impacts").

[5]*See* U.S. Department of Justice, Office of Justice Programs, National Institute of Justice, *Intimate Partner Stalking: Economic Harm Caused*, available at https://www.nij.gov/topics/crime/intimate-partner-violence/stalking/Pages/economic-harm.aspx (last visited November 14, 2018) (hereinafter "DOJ, Economic Harm"); DOJ, Report to Congress at 5.

[6]*See, e.g.*, DOJ, Health Impacts; U.S. Department of Justice, Office of Justice Programs, National Institute of Justice, Intimate Partner Stalking: Duration and Trajectory, available at https://www.nij.gov/topics/crime/intimate-partner-violence/stalking/Pages/duration.aspx (last visited November 14, 2018); U.S. Department of Justice, Office of Justice Programs, National

For the public, stalking produces significant harms.  Researchers estimate that stalking

can cost upwards of $342 million in 2003 dollars for lost productivity and mental health care

costs—and that this amount is likely a significant underestimate of the costs of stalking.[7]  It is

also widely accepted that stalking is connected to other forms of violence against

women, including domestic violence, physical and sexual assault, and murder.[8]

Despite the harms caused by stalking to both individual victims and to the public,

stalking is an offense that has historically remained underreported and under-prosecuted.[9]  Such

underreporting is a result of, among other things, inadequate protections for stalking victims, a

belief that the police cannot or will not do anything, fear that victims will not be believed, fear

of the perpetrator, not having proof of the stalking (particularly in cases of physical stalking), and

fearing that the crime will not be taken seriously.[10]

Many of these harms are abundantly present among Kukstis' victims.  Kukstis' conduct

effectively isolated both Jane Does A and E from their friends, who grew tired of Kukstis' social

media antics.  Jane Doe B joined the community of intimate partner stalking victims (described

---

Institute of Justice, Comparing the Danger Posed by Partner Stalkers Versus Non-Partner
Stalkers, available at https://www.nij.gov/topics/crime/intimate-partnerviolence/
stalking/Pages/partner-nonpartner.aspx (last visited November 14, 2018); U.S.
Department of Justice, Office of Justice Programs, National Institute of Justice, Comparing
Abusive Partners Who Do and Do Not Stalk, available at
https://www.nij.gov/topics/crime/intimate-partner-violence/stalking/Pages/stalkersnonstalkers.
aspx (last visited November 14, 2018); *see also* DOJ, Report to Congress at 4 (describing the
"numerous tangible and intangible costs" of stalking).

[7] DOJ, Economic Harm.

[8] *See*, *e.g.*, DOJ, Report to Congress at 3 (noting that of female victims who were physically
assaulted by their violent partners in the preceding year, 90 percent were stalked by that partner,
and of women murdered by their former or current partners, 54 percent had reported stalking to
the police before they were killed).

[9] DOJ, Report to Congress at 5-6 (noting that the rates of reporting for stalking crimes are
anywhere between 17 and 41 percent).

[10]*See, e.g.*, DOJ, Report to Congress at 5.

above) whose partner also physically assaulted them.  Jane Doe B is careful not to travel near

Plymouth, even to see a close family member, for fear of encountering Kukstis.  Jane Doe E's

experiences with Kukstis has left her reluctant to seek intimate relationships.  *See* Attachment A

("I have not had any desire to pursue a long-lasting relationship since I was twenty years old and

I'm not sure I will again.").

Kukstis' conduct has also left his victims reluctant to engage with others on social media.

Calls and messages from blocked numbers, for example, still summon fear in Jane Does A and

D.  As the Court considers how to address Kukstis' ability to use social media upon his release,

*supra* note 1, it should also consider the impact that Kukstis' conduct has had on his victims'

ability to access what has become a necessary tool of modern life.

Over a prolonged period, Kukstis has left lasting and profound effects on each of his

victims.  It is primarily because Kukstis targeted and hurt so many women, including two whose

conduct does not score in Kukstis' Guidelines calculation, that the government seeks a sentence

at the high end of the advisory GSR.  That these crimes largely took place from behind a

keyboard makes them more serious (and not less so) in a digital world, as a member of this

Court recently noted in sentencing a cyberstalking defendant:

> [Counsel] is right to point out that all of these crimes were committed with you
> sitting behind a computer.  That point is well taken.  Yet in today's world, that
> does not diminish the crimes in any way.  In fact it ought to bring home to all of
> us how interconnected we are and what havoc can be wreaked by the improper
> evil criminal conduct in which you so gleefully engaged.

*United States v. Lin*, 18-CR-10092 (WGY), Sent. Tr. (Exhibit B hereto).  A high-end Guidelines

sentence in this case accordingly would provide just punishment for the impact Kukstis had on

the lives of Jane Does A through E.

*B.      Deterrence*

A 51-month sentence is also necessary to deter Kukstis from re-offending upon release from custody.  It is troubling how frequently since 2009 Kukstis has returned to cyberstalking and harassment.  (PSR ¶ 36).  No doubt his therapist hoped in 2009 that continued therapy would lessen the chances that Kukstis would re-offend, but it did not.  (PSR ¶ 96).  The court that sentenced Kukstis for assaulting Jane Doe B likely anticipated that a CWOF term and a no-contact order would deter him from harassing her, but it did not.  His violation of that court's orders resulted in criminal charges and a term of pretrial probation, which themselves failed to deter Kukstis from stalking Jane Doe A.

Kukstis has repeatedly ignored both civil and criminal interventions targeting his behavior.  This conduct demonstrates a sustained disregard for the law and for the lives of others, and a Guidelines sentence of incarceration is a logical next step to achieve specific deterrence.

The Court should also impose a sentence that will deter others.  Cyber-predators are generally correct to believe that because they are hiding behind their computers, the government is less likely to detect and prosecute them than if they commit a hands-on offense.  The ability to operate anonymously with relative ease may cause them to believe, mistakenly, that cyberstalking is not a serious crime.  When law enforcement is able to unwind a network of aliases and anonymous accounts and convict a defendant, however, it is important that a Court's sentence adequately deter others who have not been caught.  If cyber criminals believe that only mild punishment will follow, there is a serious risk that they will not be deterred from harming their victims.  A Guidelines sentence of incarceration in this case will clearly signal that these crimes are particularly harmful to the public.

C.      *Proportionality*

Moreover, a 51-month sentence is reasonable when compared with sentences given to other defendants convicted for engaging in a similar conduct. *See generally United States v. Sayer,* 748 F. 3d 425 (1st Cir. 2014) (affirming a 60-month term of incarceration (14 months over the Guidelines Sentencing Range) for the cyberstalking of one victim, including by posting intimate information about the victim online); *United States v. Rubens*, 696 Fed. Appx. 941 (11th Cir. 2017) (affirming 120-month term of incarceration for cyberstalking campaign in which defendant photoshopped sexual acts of his victims and posted them online); *United States v. Conlan*, 786 F.3d 380 (5th Cir. 2015) (cyberstalking case of one victim resulting in a ninety-six month term of incarceration); *United States v. Petrovic*, 701 F.3d 849 (8th Cir. 2013) (cyberstalking case of one victim resulting in a ninety-six month term of incarceration). *Cf. United States v. Lin*, 18-CR-10092 (WGY) (17.5 year sentence to defendant convicted of cyberstalking multiple victims, distributing child pornography to victims as part of his cyberstalking campaign, and hoax bomb threats).

IV.     Restitution

The Court is required to order restitution for what it determines are the "the full amount of the victim's losses."  18 U.S.C. § 2264(b)(1).  The "full amount of the victim's losses" includes both "attorneys' fees, plus any costs incurred in obtaining a civil protection order" and "any other losses suffered by the victim as a proximate result of the offense."  18 U.S.C. § 2264(b)(3)(E), (F).

Jane Doe A has submitted for the Court's consideration receipts evidencing $23,507 in losses that she suffered as a proximate result of Kukstis' offense.  (Addendum to PSR).  In response to Kukstis' attacks, she incurred approximately $17,500 of these expenses, which

included legal, forensic, cell phone, and private investigative fees, as she attempted on her own (unsuccessfully) to identify her attacker.  She incurred the balance of her attorneys' fees and costs (approximately $6,000) in reporting through counsel to law enforcement and in assisting the government in its investigation and prosecution of Kukstis' offense.  Both categories of amounts qualify as reasonable attorneys' fees and other losses that Jane Doe A suffered as a proximate result of the offense.  They should be included in the Court's restitution award.

V.     Conclusion

Joseph Kukstis targeted several woman with mistreatment that changed their lives.  A high-end Guidelines sentence is necessary in light of the disturbing nature of Kukstis' conduct; the number of victims and his impact on them; and his complete failure to heed earlier efforts to stop him from harassing others.  The requested sentence will also promote respect for the law, deter this defendant and others, and protect the public.  Fifty-one months, however, is not greater than necessary and would not result in an unwarranted sentencing disparity among similarly situated defendants.

Respectfully submitted,

ANDREW E. LELLING
UNITED STATES ATTORNEY

By:     /s/ Seth B. Kosto
        SETH B. KOSTO
        Assistant U.S. Attorney

November 14, 2018

CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

*/s/ Seth B. Kosto*
SETH B. KOSTO
Assistant U.S. Attorney

Dated:  November 14, 2018